IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Desiree Lehr, Amanda Woolcock, Jennifer Kochniarczyk, and Erin Lindy, | ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) |
| Ascension Health, | ) ) |
| Defendant. | ) ) |

## COMPLAINT

### Introduction

1.    Defendant Ascension Health ("Ascension"), which owns and operates hospitals around the country, has a long history of cutting corners on adequate patient care in order to save money. As has been reported in the New York Times, Defendant Ascension spent years leading up to the pandemic trying to shrink labor costs as much as possible, in turn putting more money into executive compensation, which has led to dramatic short-staffing issues at Defendant's hospitals nationwide, including at Ascension Saint Joseph ("ASJ") in Joliet, Illinois. Defendant Ascension has had to resort to more complex forms of compensation in order to induce extra work at lower levels of staffing. But Defendant has unlawfully cut corners even here by failure to fully provide their employees the correct compensation.

2.    As discussed below, the named Plaintiffs in this lawsuit, and many other employees of the Defendant in the proposed class, have experienced Defendant's failure to pay the correct amounts, which are undisputed and have not been contested by Ascension. That failure includes incorrect wages, incorrect paid time off ("PTO"), incorrect disability benefits, and incorrect wage payouts as part of a fully agreed-to settlement of a contract grievance. Defendant's payroll

1

department, which upon information and belief operates out of corporate headquarters in Missouri, to cover many, many hospitals nationwide, has proved itself dysfunctional, either unwilling or unable to adequately and accurately compensate nurses like Plaintiffs and members of the proposed class. When ASJ workers bring these underpayments to Defendant's attention, Defendant is also unwilling or unable to fix their mistakes and accurately compensate these workers, even while not disputing that Defendant made the mistake. Plaintiffs bring this lawsuit on behalf of themselves and others similarly situated at St. Joseph's Hospital in order to assure that Ascension takes responsibility for what it owes these proposed class members for their essential work.

## Parties

3. Plaintiff Desiree Lehr was an employee of Defendant Ascension Health until July 2022 and is a resident of Illinois.

4. Plaintiff Amanda Woolcock is an employee of Defendant and is a resident of Illinois.

5. Plaintiff Jennifer Kochniarczyk an employee of Defendant and is a resident of Illinois.

6. Plaintiff Erin Lindy was an employee of Defendant Ascension Health until July 2022 and is a resident of Illinois.

7. Defendant Ascension is a nonprofit corporation that employed Plaintiffs, owns Ascension Saint Joseph (ASJ), and is incorporated in Missouri.

## Venue and Jurisdiction

8. Jurisdiction is proper in this case pursuant to 28 U.S.C. §1332 because the amount in controversy exceeds $75,000 and Plaintiffs and Defendant are citizens of different states.

9. Jurisdiction is further proper in this case pursuant to 28 U.S.C. §1332 because the amount in controversy in this class action exceeds $5,000,000 and at least one plaintiff is a citizen of a state different than Defendant.

10. Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. §1391 because the events giving rise to the claims occurred in this district.

## Facts

11. Since 2018, Defendant Ascension has owned Ascension Saint Joseph ("ASJ"), a hospital in Joliet, Illinois.

12. Defendant Ascension had previously operated ASJ through a joint venture called AMITA Health with AdventHealth, until that joint venture was dissolved in 2022.

13. Defendant Ascension, a Missouri-based nonprofit organization, owns and operates hospitals across the country.

14. As reported in the New York Times, Defendant Ascension has engaged in a variety of improper cost-cutting practices for such a not-for-profit enterprise in order to improve revenues and maximize executive compensation, despite having $18 billion in cash reserves.

15. One key practice of this nominally charitable enterprise has been reducing its staffing, accomplished by "wring[ing] more work out of fewer employees."

16. The Times reported that, in the five years since Defendant Ascension took over ASJ, they have cut ASJ nursing staff by 23 percent.

17. In addition to increasing adverse conditions for patients, this understaffing by Defendant Ascension has also led to ASJ nurses having to work many more shifts than is standard, with various complex compensation structures put into place to incentivize the remaining nurses to work longer hours to make up for the staff shortages.

A. **Systemic Compensation Problems**

18. For several years now, as the compensation structure has become more complex, ASJ nurses have experienced regular and repeated errors in their compensation, to which ASJ is willfully indifferent in correcting.

19. Nursing schedules are already quite a bit different and more complicated than those at nine-to-five jobs, especially since the COVID-19 pandemic, and Defendant's understaffing of ASJ have made those nursing schedules, and the resulting compensation, all the more complex.

20. Despite the dedication of these workers, ASJ has failed them time and time again, with their payroll and human resources (HR) departments making constant, repeated, and systemic errors and failing to address those errors when they occur.

21. As discussed in the examples below, in addition to their long hours of work, ASJ nurses now must also undertake the wage-and-hour calculations that Defendant Ascension should have done in order to explain how they are being undercompensated.

22. For Plaintiffs and other class members, Defendant Ascension does not contest their wage and hour calculations, but then takes no further action to pay the extra amounts due.

23. As a result, Defendant Ascension continues to undercompensate Plaintiffs and other class members, for months and in some cases years. This has led to dozens, perhaps hundreds, of ASJ employees to be undercompensated.

24. Upon information and belief, with the exception of an onsite representative, all payroll and HR for ASJ is handled remotely by Defendant Ascension.

25. Upon information and belief, Defendant's payroll and HR departments are based at Defendant's corporate headquarters in Missouri.

26. As the payroll processing is located in Missouri and far from Joliet, Illinois, where Plaintiffs and class members work, there is no management person on site in Joliet who can respond directly to Plaintiffs and class members about the wage underpayments.

27. As a result, there is no prompt or efficient resolution, or any resolution, of the numerous complaints, and the proper amount of wages continue to go unpaid.

**B.     Desiree Lehr**

28. Desiree Lehr worked as a nurse at ASJ from November 2018 to July 2022.

29. In September 2021, she began working in interventional radiology.

30. She was regularly working 4 shifts a week.

31. Under the incentive pay policy, she was entitled to an hourly premium on shifts in addition to those she worked full time.

32. She was slated to work 3 shifts one week and 2 the next, meaning that at 4 shifts a week, she was working 3 extra shifts, during which she would be entitled to this incentive pay, every two weeks.

33. Defendant initially took the position that she was not entitled to this pay during her early time working in interventional radiology, but after a union grievance, Defendant agreed to pay her incentive pay for most of these hours worked as part of a settlement.

34. The amount of this settlement was $2,275.

35. Despite Defendant agreeing to these terms, they failed to make the agreed payments for her work on the terms agreed to.

36. When she inquired as to when the payment would be made, she was told by Defendant's payroll department that the payment had already been made on March 31, 2022.

37. However, that date predated the agreement, and it became apparent that that referred to a check paid to settle a different error made by the payroll department.

5

38. When this was pointed out, Defendant employer said that they would look into it.

39. On May 31, 2022, Defendant employer said that a different pay stub provided proof of payment.

40. On June 8, 2022, Defendant employer was provided with proof that payment had not been made on that or any other pay stub.

41. In addition, during this investigation, it was discovered that there was another $762.50 that was due as a result of Defendant's error.

42. Ms. Lehr never heard from them again and has not been paid.

C. **Amanda Woolcock**

43. Amanda Woolcock has worked as a nurse at ASJ for over 6 years.

44. She works currently as a psychiatric nurse.

45. Pursuant to an agreement resolving a grievance, Ms. Woolcock was due to receive a raise of 32 cents an hour.

46. That raise in her hourly rate was supposed to be effective July 11, 2022, though by agreement Defendant employer had until August 12, 2022's paycheck to have her total compensation reflect that raise.

47. On her August 12, 2022, paycheck, her pay and paycheck did not reflect this raise.

48. Initially she was trusting, assuming that Defendant's payroll department would eventually resolve the issue on their own.

49. In early September, however, she finally decided that she needed to be proactive in getting the issue fixed.

50. She filed a ticket with HR.

51. On September 27, she received an email at 9:45 AM informing her that the matter was in progress.

52. At 10:18 AM on the same day, she got an email from HR saying the matter had been resolved, with a note saying, "if your pay rate needs to be modified talk to your manager to submit a pay rate modification request."

53. She emailed her interim manager, Christine Daniels at 10:49 PM that same day, explaining the situation and asking for help.

54. She heard nothing back and emailed again on October 6 asking for follow-up.

55. She still heard nothing and emailed again on November 4.

56. Daniels responded explaining that she was working to resolve the issue, saying that she would open up a new ticket.

57. Ms. Woolcock has not heard anything since, and still has not received her contractually mandated raise.

58. At no point has anyone contested the fact that Ms. Woolcock is entitled to this raise.

**D.    Jennifer Kochniarczyk**

59. Jennifer Kochniarczyk has been a nurse at ASJ since January 2015.

60. She works the night shift.

61. In September 2021, she hurt her knee while hiking.

62. She was forced to take several months off from work, unable to return to work until January 2022.

63. Under the established system, Ms. Kochniarczyk was supposed to use 32 hours of her banked PTO for the initial time she needed to recover from her injury, after which she would be compensated out of both the short-term disability plan, an Employee Retirement Income Security Act ("ERISA") benefit, and her extended illness bank ("EIB"), an accrued, earned benefit, in equal proportion.

64. To put it another way, the short-term disability and EIB were each supposed to cover half of her normal pay while she was recovering.

65. Ms. Kochniarczyk did indeed use 32 PTO hours and then started receiving half of her normal compensation from the short-term disability plan.

66. Defendant, however, failed to pay her the other half from her accrued EIB.

67. She ultimately received some of the money but is still missing roughly two and a half months' worth of EIB payment from this period.

68. She spoke with HR and worked with a union representative to create a spreadsheet showing the underpayments to give to HR.

69. HR never once disagreed, merely said "we'll look into it."

70. Defendant has not paid Ms. Kochniarczyk her accrued EIB time.

71. The amount she is owed is approximately $2,714 and the restoration of 41 hours of improperly used PTO.

72. While the proposed class representatives and many of their coworkers know of many such issues, it is nearly certain that there are potentially hundreds of similar issues that only Defendant is aware of. Further discovery will be necessary to determine how many employees Defendants has inadequately compensated through longstanding inaction.

**E.     Erin Lindy**

73. Erin Lindy was a nurse at SJA until July 2022.

74. She had worked at SJA since 2020 in the Medical/Surgical Unit.

75. For a period of several months from December 2021 until February 2022, while Defendant's timekeeping system was down nationwide, Defendant paid wages based on rough, often inaccurate estimates of hours worked.

76. The underpayment of wages was inadequately addressed by Defendants and is in the process of being resolved in another nationwide class action lawsuit.

77. However, Defendant also inaccurately calculated accrued benefits like PTO.

78. Lindy worked far more during this period when the timekeeping system was down than she had been immediately before, and Defendant's estimates of her time worked based on the prior period was deeply error ridden.

79. After doing calculations based on her own maintained time records, she concluded that she was supposed to have 38.8 hours of PTO banked, when her paycheck only said 19.18 hours of PTO was banked.

80. When she left ASJ for a new job, she was supposed, under Illinois law, have her banked PTO liquidated and paid out to her.

81. Rather than paying her out for all 38.8 hours of PTO she had banked, they only paid her out for 19.18 hours.

82. When she inquired to HR about this discrepancy, they told her they had already paid her out for the rest of the PTO, which was not true, and gave a date for that payment that preceded her departure, when such a liquidation of her banked PTO would not have been appropriate.

83. Lindy believes, based on conversations with her coworkers, that such issues with PTO are widespread.

## Class Definition

84. The problems of the named Plaintiffs above in obtaining the wages due to them are typical and representative of the problems of other ASJ employees of the proposed class.

85. Defendant has been willfully indifferent to correcting the underpayments to Plaintiffs and class members.

86. For purpose of legal or monetary relief, plaintiffs will seek to certify a class of all employees of Defendant Ascension (1) who are working at ASJ and (2) who have been undercompensated for their work by Defendant Ascension due to miscalculation or failure to calculate the actual hours worked and actual compensation owed, including incentive pay applicable to them.

87. The proposed class meets the requirements of Rule 23 Fed. R. Civ. P.

88. The class is sufficiently numerous, as there are at least 100 or more ASJ employees who have been underpaid for these reasons.

89. All members of the proposed class have been harmed by the same course of conduct of Defendant Ascension: failure to keep accurate payroll records for the employees of ASJ and respond with prompt and proper payments of the correct wages due to Plaintiffs and members of the class.

90. The Plaintiffs named here have claims common and typical of the class sought to be certified: Plaintiffs have experienced loss of income from erroneous classifications arbitrarily used by Defendant, tried to have Defendant correct the errors and pay them the sums owed, and faced resistance by Defendant.

91. Plaintiffs will adequately represent the class and have retained experienced class counsel for that purpose.

## Claims

**Count I: Illinois Wage Payment and Collection Act (IWPCA), 820 ILCS 115**

92. As set forth above, Defendant Ascension has failed to timely pay the correct wages, final compensation, and wage supplements to Plaintiffs and all members of the proposed class, and for all plaintiffs and class members sums are still due and owing.

93. This has resulted from Defendant's willful failure to perform its ordinary payroll obligations out of an indifference to providing the incentives promised to its nursing staff.

94. Plaintiffs and proposed class members are entitled to relief under the Illinois Wage Payment and Collection Act ("IWPCA").

95. Therefore, Plaintiffs seek, on behalf of themselves and proposed class members, the following pursuant to 820 ILCS 115/14:

    a. All unpaid wages, final compensation, and wage supplements;

    b. Damages in the amount of five percent of all unpaid compensation for each month following the date of payment during which compensation has been unpaid;

    c. Reasonable attorneys' fees and costs;

    d. All other relief this court deems just.

**Count II: Equitable Action for Accounting**

96. Plaintiffs incorporate paragraphs 1 through 73 as if restated herein.

97. Without knowing the full extent of Defendant's failure to adequately compensate class members, remedies available at law will be insufficient.

98. Discovery will be necessary to uncover the full extent of the harm.

99. Plaintiffs seek a month-by-month accounting from Defendant during this litigation to determine and correct the classifications to which class members are assigned, cross-checked by the classifications to which class members should be assigned, and the corresponding amounts due.

100. Plaintiffs seek such relief on a month-by-month basis until it is determined that Defendants have reorganized the payroll functions to address the problems raised in this action.

101. Therefore, plaintiffs seek, on behalf of themselves and proposed class members, the following equitable relief:

    a. A full accounting of all under-compensation and other errors in compensation that Defendant has been asked to address at Ascension Saint Joseph since 2013;

    b. A full accounting of the resolution of those errors;

    c. A total amount of the errors that have been claimed;

    d. A total amount of the errors that they believe they have addressed by paying out;

    e. A total amount of the errors they found they did not need to pay out;

    f. A total amount of the errors they have yet to address.

    g. A plan to accurately compensate its employees on a timely basis going forward.

Respectfully submitted,

Dated: February 22, 2023

By: /s/ *Will W. Bloom*
One of Plaintiffs' Attorneys

Thomas H. Geoghegan
Michael P. Persoon
Will W. Bloom
Despres, Schwartz & Geoghegan, Ltd.
77 West Washington Street, Suite 711
Chicago, Illinois 60602
(312) 372-2511